[688 NYS2d 3]

In the Matter of the GRAND JURY SUBPOENA DUCES TECUM Served on the MUSEUM OF MODERN ART, Respondent. THE PEOPLE OF THE STATE OF NEW YORK, Appellant.

First Department, March 16, 1999

APPEARANCES OF COUNSEL

*Mark Dwyer* of counsel (*Steven Ringer* on the brief; *Robert M. Morgenthau, District Attorney* of New York County, attorney), for appellant.

*Richard J. Davis* of counsel (*Richard A. Rothman, Josh A. Krevitt* and *Hubert E. Yang* on the brief; *Weil, Gotshal & Manges, L. L. P.,* attorneys), for respondent.

*Barbara Hoffman* of counsel (*Jeremy G. Epstein, Margaret A. Helen MacFarlane, Barbara E. Rosenberg* and *Laurelyn E. Douglas* on the brief), for Association of the Bar of the City of New York, Committee on Art Law, *amicus curiae.*

## OPINION OF THE COURT

ANDRIAS, J.

The issue presented is whether the Legislature, in enacting what is known as the New York Exemption from Seizure Law (Arts and Cultural Affairs Law § 12.03), intended it to affect criminal proceedings. Here, a New York County Grand Jury empaneled to conduct a criminal investigation issued a subpoena duces tecum to The Museum of Modern Art ordering its appearance as a witness before the Grand Jury and the production of two allegedly stolen paintings which were being exhibited at the Museum.

Based upon information obtained from heirs of the original owners, the New York County District Attorney alleges that one of the paintings, "Portrait of Wally" by the Austrian expressionist Egon Schiele, was owned by the late Lea Jaray Bondi and was stolen from her by a Nazi agent or collaborator shortly before she fled Austria during World War II. After the war ended, the painting was found among the collections of the Austrian National Gallery. Although Mrs. Bondi asked a noted Schiele expert, Dr. Rudolf Leopold, for help in retrieving her painting, he instead obtained the painting for his private collection. The second painting, "Dead City III", also by Schiele,

was owned by Fritz Grunbaum in 1938 but was stolen just before his arrest and death in Dachau. After the war, Dr. Leopold added this painting to his private collection. In 1994, Dr. Leopold sold his collection to the government-funded Leopold Foundation of Vienna for $175,000,000.

In 1997, the Leopold Foundation sent the two paintings and 150 other works by Schiele to New York for exhibition at The Museum of Modern Art. Thereafter, on January 7, 1998, just before they were to be returned to Europe, a complaint was filed with the New York County District Attorney by several Bondi and Grunbaum heirs, asserting that they were the legitimate owners of the paintings. As a result, a subpoena was issued on behalf of the Grand Jury directing the Museum to appear before it the following day and produce the paintings.*

The Museum moved to quash the subpoena on the ground it was invalid pursuant to section 12.03 of the Arts and Cultural Affairs Law. That section, which was originally enacted in 1968 as an amendment to the General Business Law, provides:

"Exemption from seizure

"No process of attachment, execution, sequestration, replevin, distress or any kind of seizure shall be served or levied upon any work of fine art while the same is enroute to or from, or while on exhibition or deposited by a nonresident exhibitor at any exhibition held under the auspices or supervision of any museum, college, university or other nonprofit art gallery, institution or organization within any city or county of this state for any cultural, educational, charitable or other purpose not conducted for profit to the exhibitor, nor shall such work of fine art be subject to attachment, seizure, levy or sale, for any cause whatever in the hands of the authorities of such exhibition or otherwise."

When it was added in 1968, the legislative memorandum noted that the bill extended a precedent established by chapter 393 (§ 1) of the Laws of 1880 (now embodied in Personal Property Law § 250), which granted a similar exemption to purely commercial exhibits at international exhibitions held under the auspices of the United States (1968 McKinney's Session Laws of NY, at 2337). It further stated that "this bill is aimed at protecting foreign exhibits only when shipped here in connection with a purely cultural exhibition and does not affect the rights of creditors of non-residents whose works are sent

---

* The People and the Museum have agreed to allow the Museum to retain custody of the paintings until the conclusion of its challenge to the subpoena.

here for commercial exhibitions at art galleries where the works are for sale" (*Ibid.*).

Governor Rockefeller, in his memorandum of approval, alluded to the incident which prompted the legislation where an out-of-State artist who loaned a substantial portion of his work to a Buffalo museum for special showing had his works seized in connection with a lawsuit, which seizure was based on his nonresidence (*id.,* at 2396).

Here, the Grand Jury issued a subpoena duces tecum without any notice that it would seek to retain custody of the two paintings specified to be produced. The Museum argues and the IAS Court found that, although a Grand Jury subpoena duces tecum may not be subject to the requirements of the Fourth Amendment thus necessitating a probable cause showing before items can be seized, it is still a "process" and results in "a seizure" in the ordinary sense of the word. Thus, the court found that, because Arts and Cultural Affairs Law § 12.03 "precludes '*any kind* of seizure' (emphasis added), its protection is not limited to seizures protected under the US Constitution" (177 Misc 2d 985, 990).

However, contrary to the IAS Court's holding, the Court of Appeals has held that a subpoena duces tecum, such as the one in question, "does not authorize the seizure, impoundment or other disruption in possession of records or property * * *. Its function is to cause the physical evidence to which it is directed to be brought before the court. It is not intended to deprive its custodian of control which is compatible with its production. So '[o]bedience to the subpoena will be complete when the books called for are presented to the grand jury in an actual session, and are taken away again * * * as soon as the particular session adjourns'" (*Matter of Heisler v Hynes*, 42 NY2d 250, 252 [citations omitted]).

In response to the decision in *Heisler*, the Legislature enacted CPL 610.25, which gives the court or Grand Jury the right to possession of the subpoenaed evidence. Such possession must be based upon "good cause shown by the party issuing the subpoena" and shall be "for a period of time, and on terms and conditions, as may reasonably be required for the action or proceeding" (CPL 610.25 [2]). That section was found constitutional a year later in *Matter of Hynes v Moskowitz* (44 NY2d 383, *appeal dismissed* 439 US 921). Significantly for the case at bar, a subsequent amendment (L 1979, ch 413, § 3) provides that "[w]here physical evidence specified to be produced will be sought to be retained in custody, notice of such fact shall be given the subpoenaed party" (*ibid*).

Thus, although the District Attorney argues that the Grand Jury has the right to possession of the subpoenaed paintings pursuant to CPL 610.25 (1), it would appear that in a case like this, where there is no evidence in the record of any notice in the subpoena served on the Museum that the two paintings will be sought to be retained in custody, *Matter of Heisler* (*supra*) is still good law and the subpoena duces tecum sought to be quashed does not authorize or call for a seizure in any meaning of the word. Indeed, in *Matter of Hynes v Moskowitz* (*supra*, at 395), in distinguishing between a search warrant and a subpoena duces tecum, the Court held that " 'a subpoena to appear before a grand jury is not a "seizure" in the [constitutional] sense, even though that summons may be inconvenient or burdensome.' " (Brackets in original). Thus, although the subpoena in issue does not constitute a seizure, assuming arguendo that one were issued with the notice required by CPL 610.25 (2), it would still not run afoul of Arts and Cultural Affairs Law § 12.03.

Aside from referring to works of fine art deposited by nonresident exhibitors for cultural, educational, charitable or other purpose not conducted for profit to the exhibitor, its operative language is identical to the act passed on May 26, 1880 "for the regulation of international exhibitions held under the supervision and auspices of the government of the United States, within the State of New York, and preventing seizure of articles and goods deposited on exhibition thereat." (L 1880, ch 393.) That statute has come down to us unchanged and is presently known as Personal Property Law § 250. In the interim, it was first consolidated in 1909 as section 1404a of the Code of Civil Procedure (L 1909, ch 65, § 1) before being added to the Personal Property Law in 1920 (L 1920, ch 934, § 1). During its sojourn in the Code of Civil Procedure, from 1909 to 1920, it was included in chapter XIII, title II (execution against property), article first (property exempt from levy and sale).

While not dispositive, there is a general rule of statutory construction that earlier statutes are properly considered as illuminating the intent of the Legislature in passing later acts; in other words, a particular statute is construed with reference to earlier statutes in pari materia (McKinney's Cons Laws of NY, Book 1, Statutes § 222). The Penal Law and the Criminal Procedure Law under which the Grand Jury and the District Attorney operate are in pari materia in that they both relate to the criminal branch of the law, but the CPLR and its predeces-

sors are not generally so related to either the Penal Law or the CPL (*id.*, § 221), although the CPLR does apply to motions to quash subpoenas issued in furtherance of a criminal investigation (*see, Matter of Cunningham v Nadjari,* 39 NY2d 314). Thus, it would seem, a section of the Arts and Cultural Affairs Law, which is a virtual carbon copy of a statute earlier consolidated in the Code of Civil Procedure and the Personal Property Law, with no reference whatsoever to the criminal statutes, cannot, without more, be considered to have been intended to affect the provisions of the Criminal Procedure Law, which applies exclusively to all criminal actions and proceedings, including criminal investigations, commenced upon or after its effective date (CPL 1.10, 1.20 [18] [b]).

As the District Attorney points out, the identical language that was applied by the IAS Court to quash the Grand Jury subpoena at issue has, since 1909, variously been placed by the Legislature in the Code of Civil Procedure, the Personal Property Law, the General Business Law, and the Arts and Cultural Affairs Law. We agree with the District Attorney that the only conceivable conclusion is that the Legislature never intended that language to apply in criminal proceedings. That conclusion is further buttressed by the legislative history of the 1968 legislation.

The Museum and the Association of the Bar's Committee on Art Law, which appears amicus curiae, place great weight upon that part of the legislative history of the section which expressed the intention to promote the arts in New York and to maintain a "free flow" of art by ensuring that New York museums and other cultural institutions could conduct exhibitions of major public interest without concern about legal processes and challenges. No one disputes that intent, but it is not contended, nor could it be, that the public interest is served by permitting the free flow of stolen art into and out of the State. It also overlooks the method adopted by the Legislature to effectuate the desired purpose of the law, namely, to protect nonresident exhibitors from "legal seizures by local creditors". Throughout the Attorney-General's Supplemental Memorandum for the Governor in support of the bill, in which he argued against providing any loophole for judgment-creditors, as urged at the time by the Association of the Bar's Committee on State Legislation, he spoke of " 'execution' ", " 'attachment' " and took into account "the relatively small number of judgment-creditors whose rights might possibly be affected, as compared with the potentially large number of non-resident lenders to museum

exhibitions who would probably be frightened-off by anything other than an omnibus exemption." (Bill Jacket, L 1968, ch 1065.)

In construing an amendment to an existing law or a new law, the courts should look at the state of the law at the time, the facts found by the Legislature, and the mischief sought to be remedied by the new legislation (Statutes, *id.*, § 95). The intent with which a statute is enacted " 'is to be collected from the context, from the occasion and necessity of the law, from the mischief felt and the objects and the remedy in view' " (*Martin v Goldstein*, 20 App Div 203, 207, quoting 1 Kent's Com 462).

The Attorney-General, in his Memorandum for the Governor, dated May 20, 1968, advised that "[u]nder existing law, exhibits on loan to museums may be seized by local creditors under a variety of provisional and other remedies." (Bill Jacket, L 1968, ch 1065.) As the Attorney-General noted, "[t]he non-residency alone of the alleged debtor, for example, is sufficient legal grounds for the issuance of an order of attachment [CPLR § 6201 (1)]. The tactical advantages which a plaintiff is enabled to obtain over a non-resident defendant whose property is thus subjected to seizure are obvious. It is equally obvious that a non-resident can easily avoid possible harassment by local creditors simply by refraining from lending his property for exhibition in this State." (*Ibid.*) According to the Attorney-General, "The bill would exempt from seizure *by* attachment, execution, sequestration, replevin, or levy or sale, for any cause whatever" (Attorney-General's Memorandum for the Governor, May 20, 1968, *id.* [emphasis added]). Clearly the intent of the legislation was to protect works of fine art from being seized by local creditors in a civil proceeding.

Again, as pointed out by the District Attorney, the 1968 Bill Jacket for the statute reflects that the only entities which submitted opinions as to the advisability of the bill were ones with purely civil interests and responsibilities. Law enforcement and criminal defense groups were not heard from for the obvious reason that no one envisioned the legislation as having any impact on criminal proceedings. In fact, the only reference to stolen art is in the Committee on State Legislation of the New York City Bar Association's memorandum disapproving the bill where, in arguing that the bill would afford special protection to works of art as against judgment and other creditors, the example was given where a "plaintiff, including a resident of this State, alleges that a work on exhibit has been

stolen from him or unlawfully retained by a bailee, he may nonetheless not replevy the property if the criteria of the bill are met." (Bill Jacket, *id.*) Again, no reference is made to any but civil remedies even where an allegation of theft is made.

There is no question that, pursuant to section 12.03 of the Arts and Cultural Affairs Law, the alleged heirs, whose complaint prompted the District Attorney's action, may not attach or otherwise seize the subject paintings as a prelude to a civil action seeking to establish ownership, their return, or payment in lieu thereof. However, that does not prevent the District Attorney, the official charged with the duty, from investigating alleged crimes. Whether the results of such investigation leads to a criminal prosecution or a decision that the ownership dispute is a purely civil matter is left to the District Attorney's prosecutorial discretion and the Grand Jury's broad powers of investigation (*see, Virag v Hynes,* 54 NY2d 437, 443; *People v Murray,* 129 AD2d 319, 321, *affd* 72 NY2d 689). As to the Museum's argument regarding the Legislature's power to exempt certain records from Grand Jury scrutiny, where such power has been upheld the legislative intent has been clear (*see, e.g., Matter of Stern v Morgenthau,* 62 NY2d 331). Such cannot be said here.

Finally, in view of our holding that section 12.03 does not apply to a subpoena duces tecum issued as part of a criminal investigation, it is unnecessary to reach the issue of whether such statute is preempted by Federal law, specifically the Federal Immunity from Seizure Act (22 USC § 2459).

Accordingly, the order of the Supreme Court, New York County (Laura Drager, J.), entered May 13, 1998, which granted the motion of respondent, The Museum of Modern Art, to quash the subpoena duces tecum, dated January 7, 1998, should be reversed, on the law, without costs, and the motion denied.

SULLIVAN, J. P., WALLACH and MAZZARELLI, JJ., concur.

Order, Supreme Court, New York County, entered May 13, 1998, reversed, on the law, without costs, and the motion to quash the subpoena duces tecum denied.