[10 NYS3d 579]

In the Matter of CESAR ADRIAN VARGAS, an Applicant for Admission to the Bar of the State of New York.

Second Department, June 3, 2015

## APPEARANCES OF COUNSEL

*Juan Cartagena*, New York City (*Jose Perez* of counsel), for applicant.

*Loretta E. Lynch, United States Attorney General*, Washington, D.C. (*Joyce R. Branda, Mark B. Stern, Daniel Tenny* and *Lindsey Powell* of counsel), for United States of America, amicus curiae.

*Eric T. Schneiderman, Attorney General*, Albany (*Barbara D. Underwood, Kristen Clarke, Denise A. Hartman* and *Andrew B. Ayers* of counsel), for State of New York, amicus curiae.

## OPINION OF THE COURT

Per Curiam.

We are called upon to determine whether an undocumented immigrant, who is authorized to be present in the United

States under the auspices of the Deferred Action for Childhood Arrivals policy of the federal government, and who meets the statutory eligibility requirements and the rules of court governing admission to the practice of law in the State of New York, may satisfy the standard of good character and general fitness necessary for admission.[1] We are further called upon to determine whether such an individual is barred from admission to the practice of law by a federal statute, 8 USC § 1621, which generally prohibits the issuance of state professional licenses to undocumented immigrants unless an individual state has enacted legislation affirmatively authorizing the issuance of such licenses. This presents an issue of first impression in New York and, in terms of the applicability of 8 USC § 1621 and its compatibility with the Tenth Amendment of the United States Constitution, an issue of first impression nationwide.

We hold that a narrow reading of 8 USC § 1621 (d), so as to require a state legislative enactment to be the sole mechanism by which the State of New York exercises its authority granted in 8 USC § 1621 (d) to opt out of the restrictions on the issuance of licenses imposed by 8 USC § 1621 (a), unconstitutionally infringes on the sovereign authority of the State to divide power among its three coequal branches of government. Further, we hold, in light of this State's allocation of authority to the judiciary to regulate the granting of professional licenses to practice law (*see* Judiciary Law § 53 [1]), that the judiciary may exercise its authority as the state sovereign to opt out of the restrictions imposed by section 1621 (a) to the limited extent that those restrictions apply to the admission of attorneys to the practice of law in the State of New York. Accordingly, we answer the first question in the affirmative and the second question in the negative.

## I. Facts Applicable to Cesar Adrian Vargas

The applicant, Cesar Adrian Vargas, was born in Puebla, Mexico, in September 1983. His mother brought him and his siblings to the United States when Mr. Vargas was 5½ years old, without lawful documentation to enter or remain in the

---

**1.** We use the term "immigrant" simply to denote an individual who has come from another country to live in the United States, in accordance with its commonly understood meaning. However, we note that the term "immigrant" has a complex definition spread across 16 pages of the United States Code (*see* 8 USC § 1101 [a] [15]; *see also In re Garcia*, 58 Cal 4th 440, 446 n 1, 315 P3d 117, 120 n 1 [discussing derivation and use of the term "undocumented immigrant"]).

United States. The family settled in the New York City area, where Mr. Vargas continues to reside today. Mr. Vargas enrolled in, and graduated from, elementary school and high school in the public school system of the City of New York. He attended St. Francis College in Brooklyn, and graduated in December 2005. Mr. Vargas thereafter applied for admission to, was accepted to, and enrolled in, the City University of New York School of Law (hereinafter CUNY). While attending law school, he served as a law intern for Main Street Legal Services, Inc., the Office of the District Attorney of Kings County, and a New York State Supreme Court Justice. He also served as a legislative intern for a member of the United States Congress. Upon graduating from CUNY in 2011, Mr. Vargas sat for the examination administered by the New York State Board of Law Examiners in July of 2011. He obtained a passing score.

In accordance with the guidelines established by the Secretary of the United States Department of Homeland Security (hereinafter DHS), Mr. Vargas submitted an application for deferred action from removal under a program entitled Deferred Action for Childhood Arrivals (hereinafter DACA).

On October 25, 2012, while Mr. Vargas' DACA application was pending, he submitted an application for admission to practice law in the courts of the State of New York (hereinafter bar application) to the Committee on Character and Fitness for the Second Judicial Department (hereinafter the Character Committee). In his bar application, Mr. Vargas disclosed that he was not a citizen of the United States and that his immigration status was "without status." He further disclosed that he did not have a social security number, and reported his tax identification number in lieu thereof. However, Mr. Vargas also advised that he had submitted an application under DACA for deferred action from removal enforcement, and explained that upon approval of his DACA application, he would receive an employment authorization and would be eligible for a social security number. On or about February 19, 2013, Mr. Vargas' DACA application was approved by the DHS, Office of United States Citizenship and Immigration Services (hereinafter USCIS). On April 16, 2013, Mr. Vargas notified the Character Committee that his DACA application had been approved by USCIS. Thereafter, he supplemented his bar application with copies of the USCIS Notice of Approval, an employment autho-

rization document,[2] a social security number and identification card issued by the Social Security Administration, a license to drive issued by the New York State Department of Motor Vehicles, and an updated employment authorization document issued by DHS. He further disclosed that he had applied for DACA renewal. More recently, Mr. Vargas submitted a copy of a USCIS Notice of Action dated February 26, 2015, which indicates that his application for renewal of deferred action relief had been approved.[3]

As required of all applicants for admission to the practice of law, Mr. Vargas' bar application was supported by several affidavits describing each respective affiant's relationship with Mr. Vargas and the affiant's opinion that he possessed the character and fitness necessary to practice law in the State of New York (see 22 NYCRR 520.12). A review of the affidavits reveals that Mr. Vargas disclosed to each affiant that he was an undocumented immigrant.

A subcommittee of the Character Committee conducted a hearing on Mr. Vargas' bar application on July 29, 2013 (see CPLR art 94; 22 NYCRR 690.6). In its written report, the subcommittee found that Mr. Vargas "appears to have stellar character," but recommended against his admission solely on the ground that it should be left to the Court to determine whether his eligibility for admission to practice law was barred by reason of his undocumented immigration status. Absent this legal issue, the subcommittee reported that it "would have no hesitation in recommending Mr. Vargas' admission to the New York Bar." The Full Committee on Character and Fitness for the Second, Tenth, Eleventh, and Thirteenth Judicial

---

2. "An alien granted withholding of deportation or removal for the period of time in that status, as evidenced by an employment authorization document issued by the Service," may seek employment in the United States for the period of said authorization (8 CFR 274a.12 [a] [10]). Such employment is "without restrictions as to location or type of employment" (8 CFR 274a.12 [a]).

3. We do not employ the term "deferred action status" because the approval of an application for deferred action from removal enforcement does not confer immigration status on the applicant. It merely constitutes recognition that DHS has determined, as a matter of prosecutorial discretion, that it will not pursue removal enforcement against the individual for the period specified in the notice of action (see U.S. Department of Homeland Security, Mem from Janet Napolitano, Secretary [June 15, 2012], http://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf [accessed June 2, 2015], cached at http://www.nycourts.gov/reporter/webdocs/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children2.pdf).

Districts adopted the subcommittee's report by a vote of 28 to 8, with two abstentions. In accordance with 22 NYCRR 690.15 of the Rules of the Appellate Division, Second Department, the Character Committee conveyed its findings to this Court.

## II. Law and Rules Governing the Admission of Attorneys and Counselors-at-Law in the State of New York

In New York, by legislative enactment, the Court of Appeals—the state's highest court—is vested with the rule-making authority to regulate "the admission of attorneys and counselors at law, to practice in all the courts of record of the state," subject to the state constitution and statutes (Judiciary Law § 53 [1]).[4] Indeed, in the United States, the authority of the judiciary to regulate the practice of law, whether it be the admission of attorneys to the bar or the disciplining of attorneys, is recognized in every state in the union (*see In re Garcia*, 58 Cal 4th at 452, 315 P3d at 124-125). The United States Supreme Court has also acknowledged that "the courts have historically regulated admission to the practice of law before them" (*Gentile v State Bar of Nev.*, 501 US 1030, 1066 [1991]).

The Court of Appeals has succinctly summarized the authority of the judiciary in the admission process as follows:

> "Admission to the Bar is a two-part qualification process. Section 53 of the Judiciary Law vests the Court of Appeals with broad authority to promulgate rules regulating the admission of attorneys to practice in this State, including the power to provide for a uniform system of examining candidates seeking admission (Judiciary Law § 53 [1], [3]). Pursuant to that authority, this Court has promulgated rules governing uniform educational requirements (22 NYCRR 520.3, 520.4, 520.5), rules creating a uniform Bar examination (22 NYCRR 520.7, 520.8), and a rule governing admission without examination (22 NYCRR 520.9). Although a person may be admitted to the Bar only by order of the appropriate Appellate Division department

***

4. Although the Court of Appeals' rule-making authority is subject to the state constitution, the constitution addresses the eligibility of persons to practice law only to the limited extent of prohibiting certain enumerated judicial officers from engaging in the practice of law (*see* NY Const, art VI, § 20 [b] [4]).

(22 NYCRR 520.1 [a]), no application may be entertained by that court unless the Board of Law Examiners, which oversees the examination, has certified that the applicant has successfully completed the examination process (*see,* 22 NYCRR 520.6, 520.7; 22 NYCRR part 6000; *see also,* Judiciary Law § 56).

"The second phase of the qualification process commences with certification by the Board, indicating that the candidate has demonstrated the requisite knowledge of the law and legal ability. The Appellate Division in each department is then charged with determining that the applicant for admission 'possesses the character and general fitness requisite for an attorney and counsellor-at-law' (Judiciary Law § 90 [1] [a]; *see also,* CPLR 9404; 22 NYCRR 520.10)" (*Matter of Anonymous,* 78 NY2d 227, 230 [1991] [footnote omitted, as exception noted therein is not applicable]).

As is relevant to the circumstances of Mr. Vargas' bar application, the governing statutory authority is limited, as it prescribes only that an applicant for admission to the practice of law obtain a certification from the New York State Board of Law Examiners that the applicant has passed the bar examination, that the applicant's character and general fitness for the practice of law has been favorably passed upon by the Appellate Division of the Supreme Court, and that the applicant has satisfied the requirements of General Obligations Law § 3-503 (*see* Judiciary Law § 90 [1] [a]; CPLR 9401 *et seq.*). The pertinent requirements of General Obligations Law § 3-503 are that the applicant submit his or her social security number and a certification that the applicant is not in violation of child support obligations, if any (*see* General Obligations Law § 3-503 [2]). In all other respects, the rules governing the admission of attorneys and counselors-at-law, including the proof necessary to sit for the New York State bar examination, are established by the Court of Appeals of the State of New York and, significantly, for the purposes of our determination, not by the state legislature (*see* Judiciary Law §§ 53, 90; Rules of Ct of Appeals [22 NYCRR] part 520; *see generally Matter of Anonymous,* 78 NY2d at 230; *Koeppel v Wachtler,* 183 AD2d 808, 809 [1992]; *Matter of Sugarman,* 51 AD2d 170, 171-172 [1976]). There is no question that Mr. Vargas has met the relevant statutory eligibility standards.

Ultimately, it is the responsibility of the four judicial departments of the Appellate Division of the Supreme Court of the State of New York to pass upon the character and general fitness of each applicant who has been certified by the New York State Board of Law Examiners to that judicial department, as required by Judiciary Law § 90 (1) and in accordance with each department's respective rules governing the procedures to be followed for the examination of the character and fitness of each applicant (*see* Judiciary Law §§ 53, 90; CPLR 9401 *et seq.*; Rules of Ct of Appeals [22 NYCRR] part 520; Rules of App Div, 1st Dept [22 NYCRR] part 602; Rules of App Div, 2d Dept [22 NYCRR] part 690; Rules of App Div, 3d Dept [22 NYCRR] part 805; Rules of App Div, 4th Dept [22 NYCRR] § 1022.34; *see generally Matter of Anonymous*, 78 NY2d at 230; *Koeppel v Wachtler*, 183 AD2d at 809; *Matter of Sugarman*, 51 AD2d at 171-172).

As explained by the Court of Appeals in *Matter of Anonymous* (78 NY2d at 230), at the Appellate Division stage of the application process, the Court's jurisdiction is limited to a determination of whether the applicant "possesses the character and general fitness requisite for an attorney and counsellor-at-law" (Judiciary Law § 90 [1] [a]; *see Matter of Shaikh*, 39 NY2d 676, 680-681 [1976]; *see also* Rules of Ct of Appeals [22 NYCRR] § 520.12 [a]). The scope of the authority of the Appellate Division to review and rule upon a bar admission application includes circumstances, as relevant here, where an applicant for admission receives an adverse decision from the Character Committee (*see e.g.* Rules of App Div, 2d Dept [22 NYCRR] § 690.17).

Significantly, although the standard bar application employed by the Appellate Division, including the form submitted by Mr. Vargas, contains an inquiry as to citizenship and, in the absence of citizenship, immigration status, neither the statutes enacted by the legislature nor the rules promulgated by the judiciary governing the admission of attorneys and counselors to practice in the state limit that privilege to citizens, those with lawful immigration status, or those aliens who are not immigrants but are lawfully in this country for a limited period of time pursuant to a visa (*see* Judiciary Law § 90 [1] [a] [admission upon certification by New York State Board of Law Examiners], [b] [admission upon application "of any person who has been admitted to practice law in another state or territory or the District of Columbia of the United States or in a

foreign country"]; 22 NYCRR 520.6 [b] [education requirements for admission upon study in a foreign country]; *see generally* 2-18 Immigration Law and Procedure § 18.04 [Matthew Bender 2013]).

### III. Deferred Action for Childhood Arrivals

On June 15, 2012, the Secretary of the Department of Homeland Security announced a new discretionary enforcement policy entitled Deferred Action for Childhood Arrivals. Generally, the DACA policy provides for, as a matter of federal prosecutorial discretion, the deferral of removal enforcement action against certain individuals who came to the United States as children and without lawful documentation (hereinafter DACA relief or deferral of removal enforcement).[5]

More specifically, in order to qualify for deferral of removal enforcement, an applicant is required to demonstrate that he or she was under the age of 16 years when he or she entered the United States and had not attained the age of 31 years as of June 15, 2012; has continuously resided in the United States for at least five years prior to the initiation of the DACA program and presently resides in the United States; has no lawful status as of June 15, 2012; is enrolled in or has graduated from high school, has obtained a GED certificate, or was

---

**5.** (*See* U.S. Department of Homeland Security, Mem from Janet Napolitano, Secretary [June 15, 2012], http://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf [accessed June 2, 2015], cached at http://www.nycourts.gov/reporter/webdocs/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children2.pdf.) The memorandum explains that, as with other policies by which enforcement authorities exercise prosecutorial discretion in the area of removal enforcement, the enforcement resources of DHS should be allocated in a manner that recognizes that certain individuals, here persons who came to the United States as children, without intent to violate the immigration laws and who otherwise are individually determined to pose no security risk or public safety concerns, are low priority cases from an enforcement perspective. (*See generally Arizona v United States*, 567 US —, —, 132 S Ct 2492, 2498-2500 [2012] [discussing the discretionary authority of DHS in implementing and carrying out removal enforcement policy]; U.S. Immigration and Customs Enforcement, Mem from John Morton, Director, Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens at 4 [June 17, 2011], http://www.ice.gov/doclib/secure-communities/pdf/prosecutorial-discretion-memo.pdf [accessed June 2, 2015], cached at http://www.nycourts.gov/reporter/webdocs/prosecutorial-discretion-memo2.pdf [listing 19 nonexclusive factors to be considered when exercising prosecutorial discretion, including lengthy residence in this country and successful pursuit of a college or advanced degree at a legitimate institution of higher education in the U.S.].)

honorably discharged from the Armed Forces or Coast Guard of the United States; has not been convicted of a felony offense, significant misdemeanor, or multiple misdemeanors; and, following a background check founded upon, inter alia, a biometric submission, has individually been determined to pose no threat to the national security or public safety of the United States (*see* U.S. Citizenship and Immigration Services, Consideration of Deferred Action for Childhood Arrivals Process;[6] *see generally* 8 USC § 1103 [a] [1], [3]; 6 USC § 202 [5]; 8 CFR 274a.12 [a] [10]; *Arizona Dream Act Coalition v Brewer*, 757 F3d 1053, 1058-1059 [9th Cir 2014]; *Arpaio v Obama*, 27 F Supp 3d 185, 194-195 [D DC 2014]; *Crane v Napolitano*, 2013 WL 1744422, *2-3, 2013 US Dist LEXIS 57788, *3-7 [ND Tex, Apr. 23, 2013, No. 3:12-CV-03247-O]). The recipient of DACA relief does not attain lawful immigration status in the United States. Rather, the recipient is merely authorized by DHS to be lawfully present in the United States without fear of deportation for a period of two years, subject to successive two-year renewals (*see* Frequently Asked Questions, Immigration Services). Nevertheless, persons granted DACA relief may be issued a driver's license and a social security number, and are issued employment authorization documents pursuant to which they may lawfully engage in employment in the United States without restriction (*see id.*; Social Security Administration, Social Security Number and Card—Deferred Action For Childhood Arrivals, http://www.socialsecurity.gov/pubs/deferred_action.pdf [accessed June 2, 2015]; National Immigration Law Center, DACA and Driver's Licenses, *Are Individuals Granted Deferred Action under the Deferred Action for Childhood Arrivals [DACA] Policy Eligible for State Driver's Licenses?* [last updated June 19, 2013], http://www.nilc.org/dacadriverslicenses.html [accessed June 2, 2015]; *Arizona Dream Act Coalition v Brewer*, 2015 WL 300376, 2015 US Dist LEXIS 8043 [D Ariz, Jan. 22, 2015, No. CV12-02546 PHX DGC]). Indeed, individuals granted DACA relief are not

---

**6.** U.S. Citizenship and Immigration Services, Consideration of Deferred Action for Childhood Arrivals Process, Frequently Asked Questions (updated Oct. 23, 2014), http://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-process/frequently-asked-questions (accessed June 2, 2015), cached at http://www.nycourts.gov/reporter/webdocs/Frequently Asked Questions_USCIS.pdf (hereinafter Frequently Asked Questions, Immigration Services); U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, USCIS Form I-821D, available at http://www.uscis.gov/sites/default/files/files/form/i-821dinstr.pdf (accessed June 2, 2015).

precluded by federal law from establishing domicile in the United States (*see* Frequently Asked Questions, Immigration Services). There is no question that Mr. Vargas has satisfied the standards established by DHS, as he was granted DACA relief in 2012 and, earlier this year, that relief was renewed. He has also obtained an employment authorization document issued by DHS, a social security number issued by the Social Security Administration, and a license to drive issued by the State of New York.

## IV. Mr. Vargas' Character and General Fitness to Practice Law

In carrying out the responsibility of passing upon the character and general fitness of an applicant for admission to the practice of law, we recognize that the practice of law is "limited to a few persons of good moral character, with special qualifications ascertained and certified after a long course of study" (*Matter of Co-operative Law Co.*, 198 NY 479, 483 [1910]). A candidate for admission to the bar should generally possess those qualities of truth-speaking, honor, and strict observance of fiduciary responsibility "that have, throughout the centuries, been compendiously described as 'moral character' " (*Schware v Board of Bar Examiners of N. M.*, 353 US 232, 247 [1957, Frankfurter, J., concurring]).

As previously indicated, absent the question raised by reason of Mr. Vargas' entry into, and remaining in, the United States without lawful documentation, the Character Committee found that he possessed the requisite character and general fitness for admission to the practice of law in the State of New York. We find that Mr. Vargas' undocumented immigration status, in and of itself, does not reflect adversely upon his general fitness to practice law. Mr. Vargas did not enter the United States in violation of the immigration laws of his own volition, but rather, came to the United States at the age of five at the hand of his mother. When considering the weight to be accorded to his unlawful entry, we are guided by the United States Supreme Court's long-standing recognition that " 'visiting . . . condemnation on the head of an infant is illogical and unjust' " (*Plyler v Doe*, 457 US 202, 220 [1982] [the undocumented status of the children vel non did not establish a sufficient rational basis for denying the educational benefits that the state afforded other residents], quoting *Weber v Aetna Casualty & Surety Co.*, 406 US 164, 175 [1972]). The logic of the Supreme Court's pronouncement is no less apt here than it

was in *Plyler.* Although, upon attaining his majority, Mr. Vargas continued to stay in the United States in violation of the federal immigration laws, we note that the United States Supreme Court has reaffirmed that, "[a]s a general rule, it is not a crime for a removable alien to remain present in the United States" (*Arizona v United States*, 567 US at —, 132 S Ct at 2505, citing *INS v Lopez-Mendoza*, 468 US 1032, 1038 [1984]). Further, it is not realistic to expect that Mr. Vargas would leave the only country he has known since the age of five and return to a country with which he now has little more than a connection by birth. In any event, that concern has been ameliorated by the implementation of the DACA policy and, as to Mr. Vargas individually, by DHS's USCIS grant of his DACA application and the renewal thereof. Indeed, as previously noted, this reality is at the heart of Department of Homeland Security's Deferred Action for Childhood Arrivals policy. The Secretary of Homeland Security declared that the United States' immigration laws were not designed "to remove productive young people to countries where they may not have lived or even speak the language," particularly when "many of these young people have already contributed to our country in significant ways" (U.S. Department of Homeland Security, Mem from Janet Napolitano, Secretary at 2 [June 15, 2012], http://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf [accessed June 2, 2015], cached at http://www.nycourts.gov/reporter/webdocs/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children2.pdf; *see Arizona Dream Act Coalition v Brewer*, 757 F3d at 1058-1059).

We find that the undocumented status of an individual applicant does not, alone, suggest that the applicant is not possessed of the qualities that enable attorneys to vigorously defend their client's interests within the bounds of the law, nor does it suggest that the applicant cannot protect, as an officer of the court, the rule of law and the administration of justice. Toward that end, we note that the states of California (*see* Cal Bus & Prof Code § 6064 [b]) and Florida (*see* Fla Stat § 454.021 [3]) have enacted statutes which specifically authorize the admission of certain persons without lawful immigration status to the practice of law provided they otherwise meet the eligibility standards for admission. Our sister states have thereby determined that the absence of lawful immigration status does not, per se, adversely reflect on the character and fitness of a person for admission to the practice of law.

Just as the Secretary of Homeland Security directed that each DACA applicant must be examined on a case-by-case basis (*see* U.S. Department of Homeland Security, Mem from Janet Napolitano, Secretary at 2 [June 15, 2012], http://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf [accessed June 2, 2015], cached at http://www.nycourts.gov/reporter/webdocs/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children2.pdf), so too is the Appellate Division required to examine each individual applicant (*see* Judiciary Law § 90 [1]; 22 NYCRR 520.10). Upon our independent review of Mr. Vargas' application for admission to practice law and the documents submitted therewith, including the recent renewal of his DACA relief, we are satisfied that Mr. Vargas possesses the requisite character and fitness for admission to practice as an attorney and counselor-at-law.

To the extent the standard for the examination of the general fitness of an applicant to practice law in the State of New York shall include an evaluation of the applicant's familiarity with the law, that question is resolved by virtue of, inter alia, the applicant's graduation "with a first degree in law from an approved law school" (22 NYCRR 520.3 [a] [1]; *see* 22 NYCRR 520.4, 520.6) and having passed the examination administered by the New York State Board of Law Examiners (*see* Judiciary Law § 90 [1]; 22 NYCRR 520.2 [a]). Mr. Vargas graduated from and received a juris doctor degree from an approved law school and thereafter passed the New York State bar examination. Having satisfied the eligibility standards equally applicable to those similarly situated, and having been so certified by the New York State Board of Law Examiners, we find no rational basis to conclude that Mr. Vargas' status as an undocumented immigrant reflects adversely on his competence to practice law in the State of New York.

## V. The Application of the Personal Responsibility and Work Opportunity Reconciliation Act and 8 USC § 1621 et seq.

While the role of the Appellate Division in the bar admission process is ordinarily limited to the question of whether an individual candidate possesses the character and general fitness required for admission to the practice of law, 8 USC § 1621 compels us, as a matter of necessity, to consider not only Mr. Vargas' character and fitness, but also, whether that statute prevents us from exercising our authority. More directly, we

are presented with a legal question: Does the application of 8 USC § 1621, as part of the immigration laws of the United States, render an undocumented immigrant ineligible for admission to practice law in the State of New York?

The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (hereinafter PRWORA), as it relates to the issues before the Court, restricts the states from conferring certain state or local public benefits, including professional licenses, upon defined "aliens" in the absence of the enactment of a state law opting out of the federal restrictions (*see* 8 USC § 1621 [a], [c] [1] [A]; [d]).

In furtherance of our examination of the impact of 8 USC § 1621 on the question of bar admissions in New York, the Court solicited and received a brief from Mr. Vargas, and amicus curiae briefs from the Attorney General of the United States and the New York State Attorney General.

PRWORA, as applicable here, is codified in title 8 (aliens and nationality), chapter 14 (restricting welfare and public benefits for aliens), subchapter II (eligibility for state and local public benefits programs), section 1621 (aliens who are not qualified *or* nonimmigrants ineligible for state and local public benefits) of the United States Code. Section 1621 is a complex and highly nuanced set of rules, definitions, exceptions, and exemptions, commencing in the first instance with a double negative qualified by an exception: *"except* as provided . . . an alien who is *not* [e.g., a qualified alien] . . . is *not* eligible for any State or local public benefit" (8 USC § 1621 [a] [emphasis added]). More specifically, the legislation restricts the granting of state and local public benefits to aliens unless: the alien is rendered exempt under section 1621 (a) (1)-(3); the particular state or local public benefit is among those excluded under section 1621 (b) and not among those defined in section 1621 (c); or, as particularly applicable here, pursuant to section 1621 (d), where the state has exercised its authority to opt out of the restrictions by the enactment of a state law after August 22, 1996, to affirmatively provide for such eligibility.

Mr. Vargas is not exempt from the restrictions imposed by 8 USC § 1621, as he is not a "qualified alien," "nonimmigrant" alien, or parolee, as those terms have been defined by the United States Congress (*see* 8 USC § 1621 [a]; *see also* 8 USC §§ 1641, 1101 *et seq.*, 1182 [d] [5]; *see generally* Tara Kennedy, Comment, *Barred From Practice? Undocumented Immigrants*

*and Bar Admissions*, 63 DePaul L Rev 833, 851-852 [Spring 2014]).[7]

Bar admissions fall within the scope of the restrictions imposed by the federal statute because professional licenses are included among the specifically defined state and local benefits and because attorney admissions are financed by "appropriated funds" of the state (8 USC § 1621 [c] [1] [A]). Indeed, New York State's annual judiciary budget measurably funds the expenses of administering the state bar examinations, office rents for the staff of the Character Committee that oversees the screening of candidates for admission, the courtrooms where successful applicants are administered the oath of office of attorney and counselor-at-law, the salaries of the nonjudicial staff who assist in the administration of the application process, and, of course, the salaries of the members of the judiciary who ultimately pass on each individual application (*see* NY Const, art VI, § 28 [b]; art VII, § 1; Judiciary Law §§ 211 [1] [c]; 212 [1] [a]; L 2015, ch 51 [eff Apr. 1, 2015]).

Two state courts that have already examined the impact of the federal legislation on the bar admission process have both recognized that 8 USC § 1621 (d) authorizes a state to enact legislation making undocumented immigrants eligible for admission. In *In re Garcia* (58 Cal 4th 440, 315 P3d 117), the Supreme Court of California, like our Court, was presented with an inquiry from its Committee of Bar Examiners as to whether an undocumented immigrant, who otherwise met the standards for admission to the bar, may be admitted to the practice of law (*see In re Garcia*, 58 Cal 4th at 446, 449, 315

---

7. *But see* Jennesa Calvo-Friedman, Note, *The Uncertain Terrain of State Occupational Licensing Laws for Noncitizens: A Preemption Analysis*, 102 Geo LJ 1597, 1626 (June 2014) (The author argues, inter alia, that "[a]ll nonimmigrants broadly defined under all provisions of the INA are eligible for professional licenses, under 8 U.S.C. § 1621, despite the fact that the version of this provision codified in the U.S. Code appears to include only those nonimmigrants defined in 8 U.S.C. § 1101. The text of 8 U.S.C. § 1621[a] [2] that was passed by Congress and published in the Statutes at Large defines eligible nonimmigrants as 'a nonimmigrant under the Immigration and Nationality Act.' The version published in the U.S. Code modifies this subpart to include a reference to '8 U.S.C. § 1101 et seq.,' purporting to define nonimmigrants under the INA by reference to this definitional section. The version published in the Statutes at Large trumps, because it is the legal evidence of the governing law, while the version in the U.S. Code is only prima facie evidence of the law" [footnotes omitted]).

P3d at 120-121, 122-123).[8] Following oral argument, but prior to the issuance of the court's determination, the State of California, by an act of the state legislature signed into law by the governor, enacted a limited opt-out provision effective January 1, 2014. That provision allowed undocumented immigrants admission to the practice of law within the state, so long as such applicants otherwise fulfilled all admission requirements. In granting the applicant admission based upon the newly enacted opt-out provision, the California Supreme Court determined that section 1621 (d) authorized a state "to make undocumented immigrants eligible for the types of public benefits for which such persons would otherwise be ineligible under section 1621(a) and 1621(c)," through the enactment of a state law, and that the newly enacted legislation removed any potential statutory obstacle posed by section 1621 (a) to Mr. Garcia's admission (*In re Garcia*, 58 Cal 4th at 457, 315 P3d at 128, citing *Martinez v Regents of the Univ. of Cal.*, 50 Cal 4th 1277, 1294-1296, 241 P3d 855, 866-867 [2010]).

In *Florida Bd. of Bar Examiners re Question as to Whether Undocumented Immigrants are Eligible for Admission to the Fla. Bar* (134 So 3d 432 [Fla 2014]), the Supreme Court of Florida was called upon to issue an advisory opinion as to whether an undocumented immigrant, who graduated from an accredited law school and who passed the state bar examination, and others who may be similarly situated, were eligible for admission to the Florida bar (*see id.* at 433). The Supreme Court of Florida held, "[t]he plain language of the statute and case law indicate that the phrase 'enactment of a State law' requires a state legislature to address this appropriations-related issue and pass legislation, which the governor must either approve or permit to become the law of the State" (*id.* at 435, quoting 8 USC § 1621 [d]). In response to the advisory opinion, the Florida Legislature enacted Fla Stat § 454.021 (3), which authorizes the Supreme Court of Florida to admit to the Florida bar certain unauthorized immigrants who were brought to the United States as minors, provided, inter alia, the ap-

---

8. Mr. Garcia, unlike Mr. Vargas, was not a recipient of DACA relief. Rather, while Mr. Garcia was still a minor, his father made an application for a change of Mr. Garcia's immigration status. That application for a change of immigration status was pending at the time of his application for admission to the bar and had been pending for some 19 years with immigration authorities (*see In re Garcia*, 58 Cal 4th at 447-448, 315 P3d at 121-122). Thus, neither Mr. Garcia nor Mr. Vargas fall within any of the three exempt categories of undocumented persons listed in section 1621 (a).

plicant fulfills the requirements for the practice of law (*see* Fla L 1955, ch 29796, §§ 1, 2, 7; Fla L 1961, ch 61-530, § 10, amended by Fla L 2014, ch 2014-35, § 3 [eff May 12, 2014]).[9]

In his appellate brief, Mr. Vargas takes the position that New York need not enact new legislation expressly permitting the admission of undocumented immigrants because an existing statute, Judiciary Law § 460, effectively operates as an opt-out provision authorized by 8 USC § 1621 (d). We disagree.

Initially, we note that Judiciary Law § 460 became law well before August 22, 1996—the threshold set forth in 8 USC § 1621 (d) after which a state may exercise its authority to opt out of the restrictions imposed by section 1621 (a). Since Judiciary Law § 460 predated 8 USC § 1621 (a), it cannot be viewed as a deliberately considered legislative determination to opt out of the restrictions imposed by the federal statute. For this reason alone, Judiciary Law § 460 cannot qualify as an opt-out provision as contemplated by 8 USC § 1621 (d).

In any event, even if a preexisting statute could qualify as an opt-out provision, we reject Mr. Vargas' contention that Judiciary Law § 460 is a legislative enactment sufficient to override the barriers imposed by section 1621 (a).

Judiciary Law § 460 provides: "Race, creed, color, national origin, *alienage* or sex shall constitute no cause for refusing any person examination or admission to practice" (emphasis added). The term "alienage," which was added to the statute in 1982 (L 1982, ch 133, § 29), is not defined in the Judiciary Law.

The term "alienage," as used in Judiciary Law § 460, is ambiguous. On the one hand, it may be expansively interpreted to prohibit the denial of New York law licenses to any person based upon the country of his or her birth, which would necessarily include Mr. Vargas despite his undocumented immigration status. Alternatively, "alienage" could more narrowly be construed as referring to persons who, while not citizens of the United States, are nevertheless present in the country only through legal means.

In view of this ambiguity, we may look to the history of Judiciary Law § 460 to help determine and give effect to the intent of the legislature (*see Roberts v Tishman Speyer Props., L.P.,* 13

---

**9.** As further discussed infra, neither the California Supreme Court nor the Supreme Court of Florida examined the question of whether 8 USC § 1621 (d) violates the Tenth Amendment by prescribing the enactment of legislation as the sole method by which an individual state may exercise its authority to opt out of the restrictions of 8 USC § 1621 (a).

NY3d 270, 286 [2009]; *Majewski v Broadalbin-Perth Cent. School Dist.*, 91 NY2d 577, 584 [1998]; *Patrolmen's Benevolent Assn. of City of N.Y. v City of New York*, 41 NY2d 205, 208 [1976]). The 1982 amendment to Judiciary Law § 460, which added the term "alienage" to the statute, was part of a broader package of amendments to several different state laws (L 1982, ch 133). The preamble of chapter 133 declared that the amendments were to eliminate discrimination against aliens who were residing legally within the state. This purpose is confirmed by the Memorandum of the Law Revision Commission which was attached to Senate Bill S2950-A, and which described the amendments as intended to eliminate statutory language that discriminated against persons "lawfully admitted for permanent residence in the U.S. under federal immigration laws" (Mem of Law Rev Commn, Bill Jacket, L 1982, ch 133). Moreover, some of the statutes amended by chapter 133, such as Civil Service Law § 53, specifically speak of aliens "lawfully admitted for permanent residence in the United States" (Civil Service Law § 53; *see* L 1982, ch 133, § 4).

We thus conclude that the legislative intent behind the word "alienage" as used in Judiciary Law § 460 does not extend to undocumented immigrants and, therefore, does not qualify as an opt out from 8 USC § 1621. The Judiciary Law's prohibition of discrimination in the issuance of law licenses based on alienage cannot extend to persons present in the United States under DACA, as DACA does not confer upon the individual lawful immigration status (*see Arizona Dream Act Coalition v Brewer*, 757 F3d at 1058; *Florida Bd. of Bar Examiners*, 134 So 3d at 436; U.S. Citizenship and Immigration Services, Consideration of Deferred Action for Childhood Arrivals [DACA], http://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-daca [updated Feb. 19, 2015], cached at http://www.nycourts.gov/reporter/webdocs/Consideration of Deferred Action for Childhood Arrivals (DACA)_USCIS.pdf).

## VI. The Application of the Tenth Amendment

It is well settled that the federal government is possessed of broad and undoubted plenary authority over matters involving immigration arising from its constitutional power to, inter alia, "establish a[ ] uniform Rule of Naturalization" (US Const, art I, § 8, cl 4; *see Arizona v United States*, 567 US at —, 132 S Ct at 2498; *Toll v Moreno*, 458 US 1, 10 [1982]; *Florida Bd. of Bar Examiners*, 134 So 3d at 434; *In re Garcia,* 58 Cal 4th at 452-

453, 315 P3d at 125; *see also Mathews v Diaz*, 426 US 67, 79-80 [1976]; *Graham v Richardson*, 403 US 365, 376-379 [1971]; *Takahashi v Fish & Game Comm'n*, 334 US 410, 418-419 [1948]; *Hines v Davidowitz*, 312 US 52, 61-63 [1941]; *Truax v Raich*, 239 US 33, 42 [1915]). Absent a constitutional conflict, a federal statute limiting the conduct or activities of aliens, immigrants, and those who are present in the United States without legal authorization is binding upon the states by virtue of the Supremacy Clause of the United States Constitution (*see* US Const, art VI, cl 2; *Arizona v United States*, 567 US at —, 132 S Ct at 2500-2501; *Chamber of Commerce of United States of America v Whiting*, 563 US —, —, 131 S Ct 1968, 1974-1975 [2011]; *Mathews v Diaz*, 426 US at 81-82; *Takahashi v Fish & Game Comm'n*, 334 US at 419; *Hines v Davidowitz*, 312 US at 62-74; *League of United Latin Am. Citizens v Wilson*, 997 F Supp 1244, 1253-1254 [CD Cal 1997]).

Narrowly read, it would appear that 8 USC § 1621 *et seq.* expressly preempt the authority of the State from issuing professional licenses. However, under a more holistic reading, including a consideration of the underlying purposes of PRWORA (*see* 8 USC § 1601),[10] the enactment of 8 USC § 1621 (a) and (c) (1) (A) is not a considered judgment by the Congress mandating the states to deny professional licenses to the defined groups of aliens, because those sections must be read together with section 1621 (d), wherein Congress expressly left the ultimate policy judgment, as to whether to extend the defined public benefits to "illegal aliens," to the individual states through its opt-out provision. In pertinent part, 8 USC § 1621 provides:

---

**10.** As relevant to our determination, the declared purposes include:
"§ 1601. Statements of national policy concerning welfare and immigration

"The Congress makes the following statements concerning national policy with respect to welfare and immigration:

"(1) Self-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration statutes.

"(2) It continues to be the immigration policy of the United States that—

"(A) aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations, and

"(B) the availability of public benefits not constitute an incentive for immigration to the United States."

"(d) State authority to provide for eligibility of illegal aliens for State and local public benefits.

"A State may provide that an alien who is not lawfully present in the United States is eligible for any State or local public benefit for which such alien would otherwise be ineligible under subsection (a) of this section *only through the enactment of a State law* after August 22, 1996, which affirmatively provides for such eligibility" (emphasis added).

In light of the opt-out provision offered by 8 USC § 1621 (d), we reject the assertion of the United States that the statute constitutes a "comprehensive ban [or prohibition] on the receipt of benefits from the state."[11]

As previously discussed, section 1621 (d) has been construed by courts in California and Florida to require the passage of an act by a state legislature, and that it be signed into law by the state's governor, as the mechanism by which a state must express its intention to opt out of the restrictions imposed by section 1621 (a) (*see Florida Bd. of Bar Examiners*, 134 So 3d at 435; *In re Garcia*, 58 Cal 4th at 456, 315 P3d at 127; *Martinez v Regents of the Univ. of Cal.*, 50 Cal 4th at 1295-1296, 241 P3d at 866-868; *see generally League of United Latin Am. Citizens v Wilson*, 997 F Supp at 1253 [general description of the opt-out procedure to provide immigrant eligibility for state benefits]). However, neither the California Supreme Court nor the Florida Supreme Court was asked to consider the issue of whether 8 USC § 1621 (d) violates the Tenth Amendment, which reserves to the individual states all powers not expressly delegated to the federal government (*see* US Const Amend X). That issue is squarely raised here by the State of New York, which argues that 8 USC § 1621 (d), by prescribing the enactment of a state law as the method by which individual states can exercise the right to opt out of the restrictions imposed by section 1621 (a), is violative of the Tenth Amendment.

Turning now to that issue, we note that the prescribed process for opting out of the restrictions imposed by section 1621 (a) is at odds with New York's bar eligibility and admission structure where, by legislative enactment, the authority over bar eligibility and the admission process rests neither with the executive nor the legislative branch of government, but with

---

11. *See* brief of United States of America, amicus curiae, at 9 (ban), 10 (prohibition).

the coequal judiciary (*see* Judiciary Law §§ 53, 90; CPLR 9401 *et seq.*; *see generally Matter of Anonymous*, 78 NY2d at 230; *Koeppel v Wachtler*, 183 AD2d at 809; *Matter of Sugarman*, 51 AD2d at 171-172).

We recognize that it is unusual for a state court to pass judgment on the constitutionality of some aspect of a federal statute. However, this is not the first time that a state court has had occasion to do so (*see e.g. Pierce County v Guillen*, 537 US 129, 138-139 [2003] [upon certiorari from the Supreme Court of Washington, reviewing the enforceability of portions of 23 USC § 409]; *Harding v Harding*, 99 Cal App 4th 626, 121 Cal Rptr 2d 450 [2002] [reviewing enforceability of the Full Faith and Credit for Child Support Orders Act (28 USC § 1738B)]). We do so here mindful that our review must be exercised most sparingly. Nevertheless, we hold that the processes by which a state chooses to exercise, by one of its coequal branches of government, the authority granted by the federal legislation is not a legitimate concern of the federal government.

The ability, indeed the right, of the states to structure their governmental decision-making processes as they see fit is essential to the sovereignty protected by the Tenth Amendment. Accordingly, we reject the further argument advanced by the United States that the application of the Tenth Amendment to the question of whether the opt-out provision of section 1621 (d) should be exercised by legislative enactment is not at issue.[12] Thus, we agree with the State of New York's contention that "[a] legislative-enactment requirement . . . would be unconstitutional because principles of state sovereignty recognized by the Tenth Amendment protect the integrity and independence of state governments against undue interference from the federal government."[13]

"[T]he States entered the federal system with their sovereignty intact" (*Blatchford v Native Village of Noatak*, 501 US 775, 779 [1991]). The Tenth Amendment preserves the integrity of state sovereignty and rests on the principle that freedom

---

**12.** *See* supplemental brief of United States of America, amicus curiae, at 12.

**13.** *See* brief of State of New York, amicus curiae, at 22-23. The Attorney General of New York is the chief law enforcement officer of the State of New York (*see Matter of Grand Jury Subpoena Duces Tecum [Museum of Modern Art]*, 177 Misc 2d 985, 993 [1998], *revd on other grounds* 253 AD2d 211 [1999], *revd* 93 NY2d 729 [1999]) and, as such, the brief submitted by the Attorney General represents the State's legal opinion on which branch of government may exercise the authority of the sovereign pursuant to 8 USC § 1621 (d).

is enhanced by the creation of two governments, not one (*see National Federation of Independent Business v Sebelius*, 567 US —, —, 132 S Ct 2566, 2602 [2012]; *Bond v United States*, 564 US —, —, 131 S Ct 2355, 2364 [2011]; *Alden v Maine*, 527 US 706, 713-714 [1999]). Inherent in the respect for state sovereignty is the recognition that " 'the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions' " (*National Federation of Independent Business v Sebelius*, 567 US at —, 132 S Ct at 2602, quoting *New York v United States*, 505 US 144, 162 [1992]), and "that Congress may not exercise power in a fashion that impairs the States' integrity or their ability to function effectively in a federal system" (*Fry v United States*, 421 US 542, 547 n 7 [1975]). Congress may not directly or indirectly compel a state to enact a specific law or implement a specific policy, nor may Congress "simply 'commandee[r] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program' " (*New York v United States*, 505 US at 161, quoting *Hodel v Virginia Surface Mining & Reclamation Assn., Inc.*, 452 US 264, 288 [1981]; *see Printz v United States*, 521 US 898 [1997]). "Indeed, having the power to make decisions and to set policy is what gives the State its sovereign nature" (*FERC v Mississippi*, 456 US 742, 761 [1982]).

The Tenth Amendment is implicated here because although Congress has left the ultimate determination whether to extend public benefits, including professional licensure, to the states, it has, at the same time, prescribed the mechanism by which the states may exercise that authority. Where, as here, New York, by its own legislative enactment, has determined that the state judiciary is the sovereign authority vested with the responsibility for formulating the eligibility qualifications and processes governing the admission of attorneys and counselors to the practice of law, that limitation cannot withstand scrutiny under the Tenth Amendment (*see Bates v State Bar of Ariz.*, 433 US 350, 360 [1977] [in its capacity as the "ultimate body wielding the State's power over the practice of law," the Supreme Court of Arizona, in its rule-making capacity, is acting as the state sovereign]; *see also Goldfarb v Virginia State Bar*, 421 US 773, 791 [1975]).

An analogy may be found in *Gregory v Ashcroft* (501 US 452 [1991]). In *Gregory,* the Supreme Court rejected a challenge by Missouri state judges who argued that a Missouri statute

requiring their retirement at age 70 violated the federal Age Discrimination in Employment Act of 1967 (29 USC § 621 *et seq.*). The Court found it "essential to the independence of the States . . . that their power to prescribe the qualifications of their own officers" should be "exclusive, and free from external interference, except so far as plainly provided by the Constitution of the United States" (*id.* at 460 [internal quotation marks omitted]).

Although *Gregory* addressed the state's interest in determining *who* holds office, the State of New York has no less an interest in determining *which* of its branches of government is empowered to exercise the discretion authorized by section 1621 (d) to determine *who* may be licensed as an attorney and counselor-at-law. Indeed, the role of New York courts in regulating attorneys is deliberate, well-considered, and time-tested. There are sound reasons why, in New York, the responsibility for attorney admissions is vested in the state's judiciary rather than in other branches or departments of government. As Judge Benjamin Cardozo declared nearly 90 years ago, an attorney is "an officer of the court, and, like the court itself, an instrument or agency to advance the ends of justice" (*People ex rel. Karlin v Culkin*, 248 NY 465, 470-471 [1928]). Consistent therewith, the judicial branch is responsible for formulating and overseeing a variety of rules governing the admission and conduct of attorneys. These include the Rules of Professional Conduct (22 NYCRR part 1200), the State Board of Law Examiners (22 NYCRR part 6000), the 50-hour pro bono requirement for new attorney admissions (22 NYCRR 520.16), the licensure of legal consultants (22 NYCRR part 521), the admission of counsel pro hac vice (22 NYCRR 520.11), the payment of biennial attorney registration fees (22 NYCRR 118.1 [g]), the parameters of attorney advertising (Rules of Professional Conduct [22 NYCRR 1200.0] rule 7.1), the requirements for attorney-client retainer agreements (22 NYCRR 1215.1, 1400.3), and the imposition of discipline upon attorneys who violate the state's ethics rules (Judiciary Law § 90 [2]).

The mere fact that the state government decision here involves undocumented immigrants, whose presence in the United States is governed by federal immigration laws and the discretionary policy of DHS, does not and cannot, consistent with the core principles of state sovereignty guaranteed by the Tenth Amendment, vest in the federal government the right to take away from the state its authority to determine which

coequal branch of government should exercise the power of the sovereign where the federal legislation has left to the states the ultimate policy determination whether to extend public benefits to such undocumented immigrants. We emphasize, however, that the Tenth Amendment concerns implicated here by the issuance of law licenses do not exist in regard to the issuance of other types of professional licenses by other arms of our state's government. Our focus here is solely upon the infringement of the judiciary's authority, as an independent and freestanding constitutional branch of state government, to issue law licenses.

Again, we note that chapter 14 of title 8 specifically declares the policy of the federal government that aliens should be "self-sufficien[t]" and that they "not depend on public resources to meet their needs, but rather rely on their own capabilities" (8 USC § 1601 [1], [2] [A]). Considering the express federal immigration policy, we find that the imposition of a barrier to the granting of professional licenses to qualified persons that does not recognize the sovereignty of the state to determine which of its coequal branches of government should exercise the authority granted by section 1621 (d) is counterproductive to the stated purposes of that policy.

Thus, giving all deference to the federal government's supreme authority to regulate immigration and to determine immigration policy, because the opt-out provision of 8 USC § 1621 (d) as it applies to the question of the admission of attorneys and counselors-at-law to the practice of law in the State of New York is constitutionally infirm, we reject its authority to mandate the governmental mechanism by which the state may exercise its discretion to opt out of the restrictions imposed by section 1621 (a). We hold that a decision to opt out from the restrictions imposed by 8 USC § 1621, to the limited extent that it governs the admission of attorneys as professional licensees, may be lawfully exercised by the judiciary in order to be consistent with the Judiciary Law of the State of New York and the sovereignty guaranteed by the Tenth Amendment.

Finding no legal impediment or rational basis for withholding the privilege of practicing law in the State of New York from undocumented immigrants who have been granted DACA relief, we exercise the discretion authorized under section 1621 (d) and declare that such persons may be admitted to the practice of law provided they otherwise, each individually, meet

the standards for admission by which all candidates for admission to the practice of law are judged. In exercising our discretion to opt out of the restrictions imposed by section 1621 (a) to the limited extent that they address the admission of attorneys and counselors to the practice of law as professional licensees, we find that New York State has taken no steps that may be construed as encouraging unauthorized entry into the United States (*see* 8 USC § 1601 [2] [B]). Rather, the determination to grant DACA relief and to grant employment authorization documents to such persons rests firmly with the Department of Homeland Security.

On the record before us, we are satisfied that Mr. Vargas meets the standards by which all candidates for admission to the practice of law are judged and that he is eligible for admission to practice law in the State of New York.

## VII. Publication of This Opinion and Order

Admission decisions are ordinarily matters considered in camera by the Character Committee and ultimately determined by the Appellate Division upon the application of the Character Committee without a formal opinion determining the application. Recognizing the effect this determination will have on the practice of law in the State of New York and potentially on the practice of law in our sister states, we elect to publish this opinion and order to the public at large.

In light of the foregoing, the application of Cesar Adrian Vargas for admission to the practice of law in the State of New York is hereby granted, subject to his submission of satisfactory proof that he has completed the pro bono service requirement of 22 NYCRR 520.16, the taking of the required oath, and the signing of the roll of attorneys and counselors-at-law.

ENG, P.J., MASTRO, RIVERA, SKELOS and DILLON, JJ., concur.

Ordered that the application of Cesar Adrian Vargas for admission to the practice of law in the State of New York is hereby granted, subject to his submission of satisfactory proof that he has completed the pro bono service requirement of 22 NYCRR 520.16, the taking of the required oath, and the signing of the roll of attorneys and counselors-at-law.